UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GEOFFREY LEWIS,<br><br>Plaintiff,<br><br>-against-<br><br>EL AD US HOLDING, INC. d/b/a EL AD GROUP, EL-AD NATIONAL PROPERTIES LLC, EL-AD NATIONAL 2016 LLC, YELLOWSTONE PORTFOLIO LLC, STAR REAL ESTATE VENTURES LLC, EYAL RABINOVITZ, and EDR CAPITAL,<br><br>Defendants. | Civil Case No. ________________<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Geoffrey Lewis ("Plaintiff"), by his attorneys Yankwitt LLP, for his Complaint against defendants EL AD US HOLDING, INC. d/b/a EL AD GROUP ("El Ad Group"), EL-AD NATIONAL PROPERTIES LLC ("El Ad National"), EL AD NATIONAL 2016 LLC ("El Ad 2016" and, with El Ad Group and El Ad National, "El Ad"), YELLOWSTONE PORTFOLIO LLC ("Yellowstone"), STAR REAL ESTATE VENTURES LLC ("Star LLC"), EYAL RABINOVITZ ("Rabinovitz"), and EDR CAPITAL ("EDR Capital" and, collectively with the foregoing, "Defendants"), respectfully alleges as follows:

## NATURE OF THE ACTION

1. This action arises out of Defendants' unlawful refusal to pay Plaintiff the fee, in the amount of at least $8.75 million, to which he is entitled in connection with his successful efforts on behalf of El Ad, Yellowstone, and Star LLC (collectively, the "Sellers") to secure the buyers—Morgan Properties Trust ("Morgan Properties") and Olayan America Corp. ("Olayan" and, with

Morgan Properties, the "Buyers")—for the Sellers' $1.75 billion sale of 48 multi-family properties in eleven states (the "Star Portfolio").

2. Plaintiff acted on behalf of the Sellers—who owned the properties through a joint venture comprising two of the country's largest real estate groups—at the direction and request of the Sellers' investment banker and agent, Rabinovitz. Indeed, as contemporaneous emails from Rabinovitz show, the Sellers expressly recognized Plaintiff's authority to act on their behalf and his role in securing the Buyers: "Yes, I confirm that you can contact Morgan on behalf of the seller. . . . From the seller [*sic*] perspective the contact with Morgan [Properties] was done through you and only you." And because Plaintiff was expressly authorized in writing by the Sellers' agent, Rabinovitz, to act on their behalf, it was understood and discussed by the parties, consistent with common industry practice, that Plaintiff would receive a fee for his work on behalf of the Sellers.

3. In addition to procuring the Buyers, Plaintiff performed substantial services on behalf of the Sellers to facilitate the sale of the Star Portfolio, including, but not limited to, providing information and documentation to advance the transaction, participating in numerous meetings to discuss the Star Portfolio and the potential transaction, and communicating with the Buyers on the Sellers' behalf to move the transaction forward.

4. Through Plaintiff's significant efforts, the Sellers were able to reach agreement with the Buyers to sell the Star Portfolio at a time when El Ad desperately needed to unload that sizeable asset.

5. Defendants, however, have wrongfully and inexplicably refused to pay Plaintiff the fee to which they acknowledged he was entitled, first falsely representing that payment would be

addressed post-closing, and later "ghosting" Plaintiff and ignoring his inquiries as to the status of his fee.

6. Plaintiff has attempted in good faith to resolve this matter amicably, but Defendants have rejected his lawful demands for compensation and falsely asserted that Plaintiff played no role in the transaction, when there is a plethora of written evidence demonstrating Plaintiff's critical role and Defendants' knowledge and authorization thereof.

7. Accordingly, Plaintiff now brings this action for breach of implied contract or, in the alternative, claims in equity for quantum meruit and unjust enrichment, to obtain the fair and reasonable fee to which he is entitled for his critical role in the transaction.

## PARTIES

8. Plaintiff is an individual who is a citizen of the United States and domiciliary of the Commonwealth of Massachusetts. Plaintiff is an attorney who has been licensed to practice law in the State of New York since 1981 and was licensed to practice law in the Commonwealth of Massachusetts from 1980 until recently entering into retired status. Plaintiff has also been a licensed real estate broker since 2012 and, during that time, has worked on various transactions with real estate firms and individuals in the United States and internationally.

9. Defendant El Ad Group is a corporation organized under the laws of the State of Delaware, with its principal place of business in New York, New York. El Ad Group markets itself on its public website as one of the nation's leading real estate companies, with billions of dollars in assets, engaging in the acquisition, development and conversion of architecturally significant residential and commercial properties in key markets throughout North America. El Ad Group markets itself as a member of the Tshuva Group of Companies (the "Tshuva Group"), a large conglomerate based in Israel with interests in energy, real estate development and construction, property rentals, and tourism projects. Upon information and belief, and as alleged

herein, El Ad Group controlled the Star Portfolio and the sale thereof to the Sellers through its ownership of El Ad National and its acts taken in connection therewith.

10. Defendant El Ad National is a limited liability company organized under the laws of the State of Florida. Upon information and belief, the sole member of El Ad National is El Ad Group. El Ad Group's public website states that El Ad National is a subsidiary of El Ad Group that is a large purchaser and owner of income-producing properties. Upon information and belief, and as alleged herein, El Ad National controlled the Star Portfolio and the sale thereof to the Sellers through its ownership of El Ad 2016 and its acts taken in connection therewith.

11. Defendant El Ad 2016 is a limited liability company organized under the laws of the State of Delaware. Upon information and belief, El Ad 2016 was a member and 50% owner, with its joint venture partner Yellowstone, of Star LLC, the owner of the Star Portfolio prior to its sale to the Sellers. Upon information and belief, the sole member of El Ad 2016 is El-Ad National 2017 Limited Partnership, a Bermuda limited partnership. Upon information and belief, the sole partners of El-Ad National 2017 Limited Partnership are defendant El Ad National, of which the sole member is El Ad Group, and El-Ad National 2017 GP Ltd., a Bermuda company, of which the sole member is defendant El Ad National.

12. Defendant Yellowstone is a limited liability company organized under the laws of the State of Delaware. Upon information and belief, Yellowstone was at all relevant times headquartered in New York, New York. Upon information and belief, the sole member of Yellowstone is Yellowstone Portfolio Trust. Upon information and belief, Yellowstone Portfolio Trust is a common law trust whose trustees are citizens of Israel.

13. Defendant Star LLC is a limited liability company organized under the laws of the State of Delaware. Upon information and belief, Star LLC was at all relevant times headquartered

in New York, New York. Upon information and belief, Star LLC was the owner of the Star Portfolio prior to its sale to the Sellers. Upon information and belief, Yellowstone and El Ad 2016 are the sole members of Star LLC.

14. Defendant Rabinovitz is an individual who is a citizen of Israel. Rabinovitz previously served as the chief investment officer of El Ad Group and as president and CEO of another Tshuva Group company, Delek Global Real Estate Group, a real estate investment company. Rabinovitz acted as the investment banker and agent for the Sellers with respect to the sale of the Star Portfolio. Upon information and belief, Rabinovitz is the managing partner of, and does business through, his firm EDR Capital.

15. Upon information and belief, Defendant EDR Capital is a partnership in which Rabinovitz and Gal Javetz are the sole partners. Upon information and belief, both Rabinovitz and Javetz are citizens of Israel. EDR Capital markets itself on its public website as a private equity and investment banking firm, specializing in origination and execution of real estate investments, strategic consultation, and asset management of properties mainly in Western Europe and the United States.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a)(3) because this is an action between citizens of different States in which citizens of a foreign state are additional parties, and because the amount in controversy with respect to Plaintiff's claims exceeds the sum of $75,000, exclusive of interest and costs.

17. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this judicial district.

## FACTUAL BACKGROUND

### A. Plaintiff Introduces the Sellers to the Buyers and Facilitates Discussions on the Sellers' Behalf.

18. On or about January 13, 2019, Plaintiff's business partner, Dani Ben Uri ("Ben Uri"), the managing partner of DBU Financial Consulting and former Head of Capital Markets at Poalim Capital Markets and Deutsche Bank Israel, contacted Leader Capital Markets ("Leader Capital"), the investment banker for the Tshuva Group and its subsidiaries (including El Ad), to inquire whether Leader Capital had any clients interested in selling a large portfolio of multi-family real estate assets. Leader Capital suggested that the Sellers may be interested in a sale of the Star Portfolio.

19. Plaintiff and Ben Uri thereafter engaged in discussions with Rabinovitz—the Sellers' investment banker and agent for the sale of the Star Portfolio—regarding the Star Portfolio and the Sellers' potential interest in a sale.

20. In March 2019, Rabinovitz authorized Plaintiff and Ben Uri to contact potential buyers of the Star Portfolio on the Sellers' behalf, provided that they first cleared any contacts with Rabinovitz.

21. In March 2019, with Rabinovitz's approval, Plaintiff approached Olayan to see if it had any interest in purchasing the Star Portfolio. Olayan's Head of Global Real Estate in London, Hani Lazkani, indicated to Plaintiff that Olayan would be interested in reviewing the Star Portfolio and directed Plaintiff to discuss it with Olayan's Head of U.S. Real Estate, Tony Fusco.

22. On March 28, 2019, Plaintiff and Ben Uri had a conference call with Fusco and his eventual successor at Olayan, Erik Horvat, in which Plaintiff conveyed general information about the Star Portfolio to Olayan.

23. On April 1, 2019, Rabinovitz, on behalf of the Sellers, sent Plaintiff a form non-disclosure agreement ("NDA") and "teaser" description of the Star Portfolio for distribution to Olayan and other potential buyers. The NDA required the counterparty to acknowledge that it had "entered into discussions with El-Ad National Properties LLC and its affiliates and subsidiaries (collectively, the 'Company') relating to Company's holdings in [Star LLC]."

24. With Rabinovitz's approval, Plaintiff solicited Olayan and other potential buyers for the Star Portfolio and sent them the NDA and teaser.

25. On April 1, 2019, Plaintiff and Ben Uri had another conference call with Fusco and Horvat to discuss Olayan's interest in the Star Portfolio. Rabinovitz and Leader Capital's CEO, Shay Ben Yakar, joined the call.

26. After the April 1, 2019 call, Fusco emailed Jonathan Morgan, an executive of Morgan Properties, advising Morgan that the Star Portfolio had been presented to Olayan as an off-market transaction and that Olayan may have an interest in pursuing a purchase of the Star Portfolio jointly with Morgan Properties. Fusco forwarded to Morgan the information he had received from Plaintiff, including the NDA and teaser.

27. On April 9, 2019, Jonathan Morgan emailed Plaintiff (and included Rabinovitz and Ben Yakar on the email), advising that Fusco had suggested that Morgan reach out to Plaintiff "directly regarding the Star opportunity" to further explore whether Morgan Properties and Olayan should pursue the transaction together. In his email, Morgan attached a signed version of the NDA that Plaintiff had sent to Fusco and requested additional information regarding the Star Portfolio.

28. Plaintiff thereafter arranged a meeting held on May 1, 2019, at Olayan's offices in Manhattan, to discuss the potential sale of the Star Portfolio. Among those who attended the meeting were Plaintiff, Fusco, Mitchell Morgan, Jonathan Morgan, Jason Morgan, Rabinovitz, and

El Ad National's chief financial officer, Arik Bronfman. At the meeting, the Olayan and Morgan Properties representatives expressed their continued interest in the Star Portfolio.

29. Ten days later, Jonathan Morgan emailed Plaintiff and Rabinovitz, advising that Morgan Properties was still evaluating the Star Portfolio and requesting a follow-up conference call to discuss the proposed transaction.

30. On May 13, 2019, a conference call was held to further discuss the Star Portfolio. Plaintiff, Ben Uri, Rabinovitz, Bronfman, Mitchell Morgan, Jonathan Morgan, Fusco, and Ben Yakar participated in the call.

31. Morgan Properties thereafter requested trailing 12-month financials for the Star Portfolio.

32. Plaintiff and Ben Uri arranged for that information to be sent to Morgan Properties by Rabinovitz.

33. By June 2019, however, Morgan Properties' interest in the Star Portfolio had waned. On June 7, 2019, Jonathan Morgan sent Plaintiff an email advising that the bid-ask spread was too far apart and, as a result, Morgan Properties was "pencils down." In his email, Jonathan Morgan advised Plaintiff to let Morgan Properties know if the Sellers were willing to adjust the Star Portfolio's pricing in the future.

**B. A Different Buyer Enters into an Agreement to Purchase the Star Portfolio.**

34. Later in 2019, a different buyer entered into an agreement to purchase the Star Portfolio.

35. On September 24, 2019, Plaintiff emailed Fusco, Mitchell Morgan, and Jonathan Morgan, informing them that the Sellers had entered into an agreement to sell the Star Portfolio. Plaintiff advised them, however, that he believed the putative purchaser might have difficulties

raising the equity needed to close the transaction. Plaintiff stated that he would keep Morgan Properties and Olayan apprised of any developments.

36. Plaintiff's belief proved to be correct, as the deal with the putative buyer of the Star Portfolio fell through.

**C. Plaintiff Revives the Transaction with the Buyers.**

37. On March 9, 2020, Plaintiff, upon Rabinovitz's request and approval, contacted the Buyers, by email to Fusco and Jonathan Morgan, about the Star Portfolio, advising them that the prior agreement to sell the Star Portfolio to the other buyers had fallen through. Plaintiff advised Fusco and Morgan that the Sellers were interested in selling the Star Portfolio and had adjusted their pricing, and he inquired whether the Buyers would be interested in revisiting a potential acquisition of the Star Portfolio.

38. The next day, Jonathan Morgan emailed Plaintiff, requesting that Plaintiff obtain written confirmation from the Sellers that Plaintiff was authorized to contact the Buyers on behalf of the Sellers concerning the Star Portfolio.

39. Plaintiff then emailed the Sellers' agent, Rabinovitz, requesting confirmation that Plaintiff was authorized by the Sellers to discuss the Star Portfolio with Morgan Properties.

40. Rabinovitz responded by email, stating:

> ***Yes, I confirm that you can contact Morgan on behalf of the seller.*** The deal is in the market for a while and sometime[s] brokers represent one potential buyer and then take it to another without approval. ***From the seller [sic] perspective the contact with Morgan was done through you and only through you***.

41. Plaintiff then informed Jonathan Morgan of the Sellers' written confirmation of his authority and provided him with updated financials for the Star Portfolio that had been provided to him by Rabinovitz.

42. The Sellers and the Buyers thereafter engaged in discussions regarding the Star Portfolio.

43. As discussions continued in a positive direction, in November 2020, Plaintiff and Rabinovitz discussed the Sellers' payment of a fee to Plaintiff for his services on their behalf.

44. Seeking to deflect from the Sellers' obligation to pay Plaintiff the fee for his services, Rabinovitz informed Plaintiff that he had discussed the issue of Plaintiff's fee with the Buyers and requested that such fee be included in the sales agreement. Rabinovitz further advised Plaintiff that Jonathan Morgan had told him in writing that Plaintiff's fee would be resolved post-signing and that "Morgan Properties is very professional, we don't see this as a concern."

45. On November 20, 2020, the Sellers and the Buyers entered into an agreement for the Buyers to acquire the Star Portfolio.

**D. Plaintiff Is Wrongfully Denied Compensation for His Services by the Defendants.**

46. Based on Rabinovitz's representations that the Buyers would pay a portion of Plaintiff's fee and Rabinovitz's insistence that Plaintiff contact the Buyers to raise that issue with them, Plaintiff reached out to the Buyers' representatives to seek the Buyers' payment of a portion of his fee. Those efforts were unsuccessful.

47. Thereafter, on December 21, 2020, Plaintiff emailed Jonathan Morgan, Mitchell Morgan, Fusco, Horvat, and Rabinovitz, reiterating his request that the parties pay him and Ben Uri the fee to which they were entitled for their services.

48. Horvat, of Olayan, responded the next day, stating that the Buyers would not pay Plaintiff a fee because "neither you nor anyone affiliated with you served in a broker capacity for either Olayan or Morgan [Properties] in connection with the pending transaction." The email further stated that "our records reflect our understanding that any involvement you may have had was as agent to either the seller or the seller's broker. Consistent with that understanding, we have

written correspondence from you 'confirm[ing] that you may contact Morgan on behalf of the seller.' . . . To the extent you believe you are entitled to any compensation in connection with this pending transaction, we suggest that you resolve that with seller's broker, to whom we have made our position clear."

49. The statements from Olayan's representative contradicted Rabinovitz's prior statements suggesting that the Buyers had agreed to address Plaintiff's fee at closing.

50. After the falsity of Rabinovitz's representations was made clear, Plaintiff sought payment of his fee from the Sellers (as had been originally intended) through Rabinovitz.

51. On a January 6, 2021 telephone call, Rabinovitz told Ben Uri that he would discuss Plaintiff's fee with Yitzak Tshuva, the head of the Tshuva Group and Chairman of El Ad Group. Rabinovitz informed Ben Uri that he would "take care of it" by telling Tshuva about the role Plaintiff and Ben Uri played in facilitating the transaction and that "something should be done."

52. In February 2021, the sale of the Star Portfolio to the Buyers was consummated.

53. On February 4, 2021, Morgan Properties and Olayan issued a joint press release announcing the acquisition of the Star Portfolio, which they described as a joint venture between El Ad National and Yellowstone, for $1.75 billion.

54. On February 23, 2021, El Ad's outside counsel for the Star Portfolio transaction, Davis Polk & Wardwell LLP, released a statement announcing that it had advised El Ad Group in connection with the sale.

55. On information and belief, Rabinovitz, through his firm EDR Capital, received a fee from the Sellers for his role and work in connection with the sale of the Star Portfolio.

56. On March 19, 2021, Leader Capital's chief executive officer, Ben Yakar, informed Ben Uri that he had spoken with Tshuva regarding the payment of a fee to Plaintiff and Ben Uri, and that Tshuva stated that they should seek to be paid out of Rabinovitz's fee.

57. Plaintiff and Ben Uri thereafter repeatedly attempted to contact Rabinovitz about payment of their fee, but Rabinovitz ignored their requests.

58. Plaintiff, through his attorneys, then sent a letter to the Defendants demanding payment of at least $8,750,000 (calculated as one-half of one percent of the transaction value), representing the minimum customary fee to which brokers are paid for similar services.

59. El Ad responded, through its attorneys, by claiming that "it was the first time [El Ad] had ever heard of" Plaintiff and denying that it had any obligation to pay Plaintiff a fee. El Ad's response was absurd, given that a high-level El Ad officer had attended a meeting with Plaintiff at Olayan's New York offices, engaged in numerous calls related to the transaction in which Plaintiff and others participated, and was included on numerous emails with Plaintiff regarding the transaction, and that Rabinovitz had confirmed that Plaintiff was authorized by the Sellers to act on their behalf.

60. Rabinovitz, through his attorneys, likewise denied any obligation to pay Plaintiff his fee, falsely stating that Rabinovitz had told Plaintiff that the Sellers would not be responsible for any fees payable to the brokers.

**COUNT I – BREACH OF IMPLIED CONTRACT**

61. Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

62. Plaintiff performed substantial, critical services facilitating the sale of the Star Portfolio at the request and direction of Defendants, including, but not limited to, introducing the Buyers to the Sellers, providing information and documentation to advance the transaction,

participating in numerous meetings to discuss the Star Portfolio and the potential transaction, and communicating with the Buyers on the Sellers' behalf to move the transaction forward.

63. Defendants accepted Plaintiff's services knowing that Plaintiff expected to be paid the compensation customarily paid for similar services on comparable transactions.

64. The course of conduct between Plaintiff and Defendants demonstrates that the parties understood that Defendants had entered into a contract with Plaintiff, under which Plaintiff was to provide services for Defendants, with an expectation that Plaintiff was to be compensated for his services.

65. Plaintiff fully performed under the implied contract, including, among other things, by introducing the Buyers to the Sellers and taking numerous other steps to facilitate the transaction.

66. Plaintiff's compensation became due and owing when the Star Portfolio transaction closed in February 2021.

67. Defendants have breached the implied contract by failing and refusing to pay Plaintiff the compensation due and owing to Plaintiff following Defendants' acceptance of Plaintiff's services.

68. As a result of Defendants' breach of the implied contract, Plaintiff has been damaged and is entitled to customary compensation comparable to that provided in similar transactions, in an amount to be determined at trial, but in no event less than $8,750,000.

**COUNT II – QUANTUM MERUIT (IN THE ALTERNATIVE)**

69. Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

70. Plaintiff performed services for Defendants for the sale of the Star Portfolio in good faith.

71. Defendants accepted Plaintiff's services in connection with the sale of the Star Portfolio.

72. Plaintiff had the expectation of reasonable compensation for his services.

73. Plaintiff has not received any compensation for the services he rendered to Defendants in connection with the sale of the Star Portfolio.

74. Plaintiff is entitled to the reasonable value of the services he provided to Defendants in connection with the sale of the Star Portfolio, in an amount to be determined at trial, but in no event less than $8,750,000.

**COUNT III – UNJUST ENRICHMENT (IN THE ALTERNATIVE)**

75. Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

76. Plaintiff provided substantial work and devoted effort and resources to and on behalf of Defendants.

77. Defendants were substantially enriched as a direct result of Plaintiff's work and efforts at Plaintiff's direct expense.

78. Plaintiff provided services to Defendants in good faith and with the expectation that he would be compensated for his work.

79. Defendants knowingly and willingly accepted Plaintiff's services with full knowledge and expectation that they would be required to compensate Plaintiff for his services.

80. Despite due demand, Defendants have failed to compensate Plaintiff for all sums which are rightfully due and owing to him.

81. Equity and good conscience require Defendants to compensate Plaintiff for all sums which are rightfully due and owing to Plaintiff. Were Plaintiff not compensated the amount he is

rightfully due and owed, Defendants would receive a windfall in the form of uncompensated professional services from Plaintiff.

**JURY DEMAND**

82. Pursuant to the provisions of Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

A. For damages on Counts I through III in an amount to be determined at trial and exceeding $75,000, exclusive of interest and costs;

B. Pre- and post-judgment interest, in an amount to be determined at trial; and

C. Such other and further relief as this Court may deem just and proper.

Dated: November 27, 2024
White Plains, New York

YANKWITT LLP

By: _/s/ Russell M. Yankwitt________

Russell M. Yankwitt
Jonathan Ohring
Scott L. Wenzel
140 Grand Street, Suite 705
White Plains, New York 10601
Tel: (914) 686-1500
Fax: (914) 487-5000
russell@yankwitt.com
jonathan@yankwitt.com
scott@yankwitt.com

*Counsel for Plaintiff*